*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0382P (6th Cir.)
File Name: 03a0382p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

TAMMY and STEVE BERGER, as parents and legal guardians for their minor child, Travis Berger,

  *Plaintiffs-Appellants/ Cross-Appellees,*

   *v.*

MEDINA CITY SCHOOL DISTRICT,

  *Defendant-Appellee/ Cross-Appellant.*

Nos. 01-3874/3912

Appeal from the United States District Court for the Northern District of Ohio at Cleveland. No. 00-02508—John M. Manos, District Judge.

Argued: September 9, 2003

Decided and Filed: October 29, 2003

Before: GUY and DAUGHTREY, Circuit Judges; LAWSON, District Judge.[*]

———————

#### COUNSEL

———————

**ARGUED:** Stephen O. Walker, Beachwood, Ohio, for Appellants. Julie Carleton Martin, SCOTT, SCRIVEN & WAHOFF LLP, Columbus, Ohio, for Appellee. **ON BRIEF:** Stephen O. Walker, Beachwood, Ohio, for Appellants. Julie Carleton Martin, SCOTT, SCRIVEN & WAHOFF LLP, Columbus, Ohio, for Appellee.

———————

#### OPINION

———————

RALPH B. GUY, JR., Circuit Judge. Plaintiffs, Tammy and Steve Berger, appeal the judgment entered in this action brought under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1415, which sought reimbursement for the tuition plaintiffs paid to have their hearing-impaired son, Travis, attend private school for the 1999-2000 school year. The district court found that although the Medina City School District failed to offer Travis a free appropriate public education (FAPE), plaintiffs were not entitled to tuition reimbursement both because the private placement was not proper and because plaintiffs failed to give notice of their intention to withdraw their son from the public school.

Plaintiffs' appeal challenges the district court's denial of their requests for reimbursement and for attorney fees as a

———————

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

"prevailing party." Defendant Medina cross-appeals from the determination that it failed to offer Travis a FAPE. After review of the record and the arguments presented on appeal, we affirm.

## I.

In September 1994, plaintiffs and their five-year-old son, Travis, moved into the Medina City School District and enrolled him in Medina's Kindergarten Center. Travis, born July 31, 1989, has a profound hearing loss which entitles him to special education services under the IDEA.[1] At plaintiffs' insistence, Medina provided Travis with a frequency modulation (FM) system for Travis to use at school. The FM system allows a teacher or other student to speak into a microphone that sends a radio signal to a receiver connected to Travis's hearing aides. Its purpose is to overcome distance and noise by functioning as if the speaker is only six inches from the ear. The staff also was provided in-service training by Jo Ann Ireland, a consultant from a resource center for special education.

During the next four years, Travis attended first through fourth grades at Medina's Heritage Elementary School, which had an "open" classroom structure with dividers that did not reach all the way to the ceiling. In each year, Travis was educated in a regular education classroom with special education support; provided additional speech and language therapy; and offered some "pre-tutoring" of new vocabulary and concepts. Travis also received speech and language therapy through the summer breaks. Plaintiffs participated,

---

[1] Describing his hearing loss as profound, the Impartial Hearing Officer (IHO) indicated that without his hearing aides Travis was unable to hear someone shouting two inches from his ear. With only his hearing aides, he could detect various vowel sounds in a quiet room at a distance of three feet but could not distinguish them. Travis supplemented his hearing with some lip reading, but did not know sign language.

with the advice of counsel, in the development of an Individualized Education Program (IEP) during each of those years. In his first-grade year, Medina provided a "back up" FM system; speech and language therapy twice a week with Marjorie Kulbis, who had 25 years' experience and a master's degree in speech and language pathology; and special education support in the classroom from Eileen Lehrer, a certified special education teacher, and her aides.

At plaintiffs' request, the IEP developed in his second-grade year added articulation goals for speech and language therapy. In third grade, Ms. Ireland, who was then employed by defendant as a special education coordinator, provided in-service training for the staff at Heritage Elementary who were working with Travis. Travis also began receiving separate articulation therapy with Gina Ellibee, who had bachelor's and master's degrees in communication disorders with an emphasis in speech and language pathology. Mrs. Berger attended most of those therapy sessions. An evaluation completed at the end of third grade noted that Travis had demonstrated progress, but that he continued to have difficulty with comprehension and abstract concepts. His scores on IQ and achievement tests at that time were in the average or low normal range.

For fourth grade, Travis was placed in Joan Smith's regular classroom with the FM system and support from Mrs. Lehrer and her aides. As in the past, the IEP, signed in December 1998, continued to include speech and language therapy with Ms. Kulbis, articulation therapy with Ms. Ellibee, and pre-tutoring of new vocabulary both in therapy and at home. Mrs. Smith provided plaintiffs some information on most Mondays for pre-tutoring purposes and had Travis keep a daily assignment book.

Although plaintiffs saw a slide in Travis's grades and competency test scores from second grade on, it was during the fourth grade that he lost his enthusiasm for school and

complained that he did not understand what he was being asked to do. Travis began having at least two and sometimes as much as four hours of homework a night. In the first half of the year, Travis was having difficulty with the math curriculum and was receiving a "D" in math. As a result, the IEP team met in February 1999 and agreed that Travis should receive specialized instruction from a math teacher, Alice Paul, four times a week for thirty minutes a day. Because this math intervention program was a regular education program for "at risk" students, the IEP was not amended to reflect it. However, the IEP's objectives for math were modified to allow Travis to use a calculator, number line, or multiplication table in doing three-digit addition, subtraction, and multiplication. The IEP, with those changes, was signed by everyone, including plaintiffs. In the last quarter of fourth grade, Travis received a "D" in written language, and an "F" in both math and reading. Plaintiffs made it known that they thought Travis should be retained in fourth grade.

On May 18, 1999, the IEP team, including plaintiffs, met to review the year's progress and discuss placement for the following year. Ms. Ireland prepared an outline of reasons why Travis should not be retained and reviewed them at the meeting. Emphasizing the importance of support from his peer group, she also suggested that repeating the fourth grade would not change the fact that Travis was a "concrete thinker" who would struggle with an abstract curriculum. Ireland felt it was better to modify and adapt the fifth-grade curriculum than to retain him in fourth grade. It was recommended that Travis be promoted to fifth grade and placed in the resource room for part of the day to receive small group instruction in math and language arts and to allow the instruction to be presented in a more concrete form. There was also discussion about whether Travis would be placed in a fifth-grade classroom with or without support from Mrs. Lehrer. There was testimony that, either way, the resource room aides would be involved in Travis's regular education classroom.

Mrs. Lehrer, Mrs. Smith, Ms. Paul, and Ms. Ellibee all agreed that resource room placement would be appropriate. Each member of the IEP team, including plaintiffs, initialed and dated the IEP with the understanding that Travis would be promoted to fifth grade and placed in the resource room for part of the day. Plaintiffs concede that they consented to this placement, did not advise the school that they rejected this plan, and did not mention the possibility of removing Travis from Heritage Elementary. The question of which fifth grade classroom Travis would be placed in was left open, but the principal, Barbara Gunkelman, advised plaintiffs by telephone during the summer that Travis would be in Mrs. Ellenberg's regular fifth grade class without Mrs. Lehrer and her aides.

In a letter dated July 23, 1999, plaintiffs requested a due process hearing. The letter, sent to the superintendent, Charles Irish, stated as follows:

> My Wife and I are not happy and have not been happy with the program the Medina Schools have offered our child. We believe that the service offered was not sufficient to meet our child['s] needs. I guess the last straw was the school['s] decision to pass him on to the next grade. With the years of failure in the previous program and our child['s] growing unhappiness we have decided to look elsewhere to meet his needs. We are requesting a due process hearing and as part of that process we will be looking to the school to reimburse us for the cost of properly educating him elsewhere. We have "Whose Idea Is It Anyway" please send any other documents pertaining to our rights.

This letter was referred to Dr. Brad Garner, Medina's Director of Student Services, who notified the state of plaintiffs' request for a due process hearing. He then called plaintiffs and offered to meet with them about their concerns, or, in the alternative, to submit the matter to the state's mediation process. Mr. Berger declined, advising Dr. Garner that Travis

was going to attend another school and that Medina was going to pay for it. Plaintiffs also sent a note to the principal dated August 24, 1999, which stated only that Travis would not be attending Heritage Elementary that year.

Before writing to defendant, plaintiffs had visited Medina Christian Academy (MCA), a private sectarian school, and arranged for Travis to repeat fourth grade in the fall. MCA provided no special education services, but offered smaller class sizes and a "closed" classroom building with carpeted hallways. Plaintiffs took it upon themselves to arrange for Travis to continue receiving speech and language therapy outside school.[2]

Plaintiffs testified that Mrs. Chase, Travis's fourth-grade teacher at MCA, received training on how to use the FM system and took care to speak directly into the microphone and to repeat questions or comments from classmates. Mrs. Chase provided all of her students with detailed weekly lesson plans, which plaintiffs used to pre-tutor Travis at home. Travis's class at MCA had 18 students, while his fourth-grade class at Heritage had 23 or 24 students. Plaintiffs testified that Travis did well at MCA, his grades improved, he learned his math facts, and he was reading at or above a fourth-grade level.

The due process hearing was conducted before an Impartial Hearing Officer (IHO) over fourteen days between September and December 1999. In a written decision dated May 23, 2000, the IHO found that while defendant failed to provide Travis with a FAPE, plaintiffs were not entitled to reimbursement. Both sides pursued an administrative appeal to a State Level Review Officer (SLRO), but the IHO's

---

[2]Defendant prepared an application for "flow through" funds for MCA to use for special education services, but MCA declined.

findings and conclusions were affirmed in a written decision dated August 23, 2000.

Plaintiffs commenced this action and defendant counterclaimed, each seeking review of adverse findings by the SLRO. On cross-motions for review of the administrative decision, the district court granted both motions in part and found, based on a modified *de novo* review, (1) that although the procedural defects in the IEP were *de minimus*, the IEP was substantively flawed so as to deprive Travis of a FAPE; (2) that plaintiffs were not entitled to reimbursement both because MCA was not a "proper placement" and because plaintiffs unilaterally withdrew Travis without first giving defendant an opportunity to remedy the IEP; and (3) that plaintiffs were not entitled to attorney fees as a "prevailing party" under the IDEA. Judgment was entered accordingly on July 17, 2001. Plaintiffs appealed and defendant cross-appealed.[3]

## II.

*Board of Education v. Rowley*, 458 U.S. 176, 206 (1982), requires the district court to undertake a "modified *de novo* review" of the administrative decision in an action brought under the IDEA. In doing so, the district court must make an independent examination of the evidence and base its decision on a preponderance of the evidence contained in the complete record, while giving "due weight" to the factual findings made in the state administrative proceedings; particularly when educational expertise is essential to those findings. *N.L.*

---

[3]Defendant also argued in the administrative proceedings that it would violate the Establishment Clause to order reimbursement for tuition paid to a secular private school. Both the IHO and the SLRO rejected this defense in reliance on *Peck v. Lansing School District*, 148 F.3d 619 (6th Cir. 1998) (provision of remedial services to disabled student in parochial school would not violate the Establishment Clause). This argument has been abandoned on appeal.

*v. Knox County Sch.*, 315 F.3d 688 (6th Cir. 2003); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir.), *cert. denied*, 533 U.S. 950 (2001); *Burilovich v. Board of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir.), *cert. denied*, 531 U.S. 957 (2000). We recently explained that in applying this standard, the "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich*, 208 F.3d at 567.

On appeal, however, this court must apply a clearly erroneous standard of review to the district court's findings of fact and a *de novo* standard of review to its conclusions of law. *Knable*, 238 F.3d at 764; *see also Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 503 (6th Cir. 1998); 20 U.S.C. § 1415(i)(2) (formerly 20 U.S.C. § 1415(e)(2)).

**A.   Tuition Reimbursement under the IDEA**

The Supreme Court has explicitly held "that IDEA's grant of equitable authority empowers a court 'to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12 (1993) (quoting *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 369 (1985)). Parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Burlington*, 471 U.S. at 373-74. In that situation, the parents are "entitled to reimbursement *only* if a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper under the Act." *Carter*, 510 U.S. at 15. *See also Knable*, 238 F.3d at 763. Although plaintiffs appeal from the

determination that the private school placement was not proper, we turn first to the questions raised by defendant's cross-appeal from the finding that the public school placement violated the IDEA by denying Travis a FAPE.

**1.   FAPE**

In determining whether the public placement violated the IDEA, the reviewing court must undertake a twofold inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982) (footnotes omitted). There is no violation of the IDEA if the school district has satisfied both requirements. *Id.* at 207; *Knable*, 238 F.3d at 763.

With respect to the procedural prong, the district court, agreeing with the SLRO, found that the IEP developed during Travis's fourth-grade year was procedurally deficient because it failed to properly state present levels of educational performance that specifically related to meaningful annual goals or specific short-term objectives as was required by the IDEA, 20 U.S.C. § 1414(d)(1)(A) (formerly § 1401(a)(20)). *See Rowley*, 458 U.S. at 182 & 206 n.27. Defendant has not objected to this finding, perhaps because several of defendant's witnesses conceded that the IEP was flawed, but emphasizes the district court's further finding that the deficiencies were *de minimus* and did not violate the IDEA because the record was clear that "information absent from the IEP was nonetheless known to all the parties." *Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990).

Plaintiffs take issue with this further finding, arguing that they are entitled under "equitable principles" to reimbursement because of the "egregious nature" of defendant's procedural violations. A procedural violation of

the IDEA is not a *per se* denial of a FAPE. *Knable*, 238 F.3d at 765. Rather, a procedural violation will constitute a denial of a FAPE only if it causes substantive harm to the child or his parents; such as seriously infringing on the parents' opportunity to participate in the IEP process, depriving an eligible student of an IEP, or causing the loss of educational opportunity. *Id*. at 765-66.

The evidence in this case showed that plaintiffs participated in the IEP meetings, had regular communication with the teachers and special education staff, and were engaged in Travis's schooling on a daily basis. Travis's educational performance was being evaluated both in the classroom and by standardized testing, and specific action was taken to address the difficulties he was having in math. It was not clear error for the district court to find the procedural deficiencies in the IEP did not deny Travis a FAPE.[4]

With respect to the substantive prong of the *Rowley* test, the district court agreed with the SLRO's determination that the IEP's special education program and related services were "improperly and haphazardly executed" and therefore were not reasonably calculated to enable Travis to receive educational benefits. Defendant's cross-appeal maintains that this determination was not supported by the evidence as a whole. The district court explained that

a number of witnesses testified that daily "pre-tutoring" services were essential to Travis's educational success.

---

[4] *Compare Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 399 (6th Cir. 1998) (failure of IEP to provide any appropriate criteria for measuring the student's progress was not technical, but "went to the heart of the substance of the plan"), with *Kings Local Sch. Dist. v. Zalazny*, 325 F.3d 724, 732 (6th Cir. 2003) (failure to have parents present at a meeting caused no substantive harm where parents were integrally involved in each step of the development and implementation of the IEP).

The [SLRO] found, however, that the pre-tutoring services were offered only twice a week for twenty minutes, and that what was offered by the school was haphazard and did not include assistance with all subjects. The school district's own witnesses, most notably Mrs. Ireland, Ms. Smith and Mrs. Kulbis, admitted that pre-tutoring was often disorganized and depended heavily on the parents' involvement. This being so, the Court can find no reason to reject the finding of the [SLRO] and holds that the school board's program for Travis was not "reasonably calculated" to provide Travis with "educational benefits."

(Citations and footnotes omitted.) The district court also observed that Mrs. Smith "went so far as to admit that she was not even sure what subjects were covered by the speech therapist, the only school staff member doing any pre-tutoring with Travis, and never spoke with the parents concerning their pre-tutoring efforts."

The significance of pre-tutoring has to do with aiding the normal process of auditory-cognitive closure, which is the unconscious filling in of gaps in our hearing based on prior knowledge, language, and experience. Pre-tutoring involves the introduction of new vocabulary or information before the lesson or discussion in the classroom. According to Dr. Carol Flexer, an audiologist who testified on behalf of plaintiffs, pre-tutoring is a "critical accommodation" that allows a child to participate and extract meaningful information from the teaching and discussions that occur in the classroom.

Defendant does not dispute that pre-tutoring is a critical service for Travis and most hearing-impaired students. Instead, defendant argues, in essence, that the district court was not only wrong about what pre-tutoring Travis was receiving but also improperly focused on pre-tutoring to the exclusion of the other services and educational benefits that Travis was provided under the IEP. The adequacy of the

abbreviated lesson plans sent home by Mrs. Smith was contested in the due process proceeding, and the SLRO noted the dispute as to how much pre-tutoring was or should have been provided by the parents based on the information sent home by Mrs. Smith. Defendant emphasizes that, in addition to the twice-weekly pre-tutoring by Ms. Kulbis, Mrs. Lehrer and her aides assisted Travis on a daily basis by explaining things when he did not understand, repeating or clarifying information, and looking over his class work. This assistance, defendant argues, included "all the essential elements of pre-tutoring."

There was certainly evidence of shortcomings in the pre-tutoring Travis received, whether from his parents, Ms. Kulbis, or Mrs. Lehrer and her aides, yet we cannot lightly dismiss defendant's contention that Travis was nonetheless provided an IEP that was reasonably calculated to provide educational benefit. The IEP provided Travis with speech and language therapy, articulation therapy, accommodation in the classroom through the FM system and placement near the teacher, assistance during academic subjects from special education staff in the classroom, and individualized instruction in math and language arts by placement in the resource room for part of the day. Defendant also contends that, notwithstanding the slide in his grades during the year he was in Mrs. Smith's class, there was evidence that Travis was still making educational progress as demonstrated by his standardized test scores; his increased participation in classroom discussions; and his progress in speech, language, and articulation therapy. Because we conclude that the outcome of this appeal does not depend on this issue, however, we assume without deciding that pre-tutoring services were so critical to the IEP that the inadequacies in defendant's delivery of pre-tutoring services denied Travis a FAPE.

### 2.   Private Placement

Challenging the district court's finding on this issue, plaintiffs contend that their placement of Travis at MCA was appropriate because it was "reasonably calculated to enable [Travis] to receive educational benefits." *Knable*, 238 F.3d at 771 n.6. Plaintiffs are correct that the statutory requirements of a FAPE do not apply to private school placements. *Carter*, 510 U.S. at 13-14. Even so, parents will not be entitled to reimbursement for a private school placement unless it offers their disabled child "an education otherwise proper under [the] IDEA." *Id*. at 12-13.[5]

Plaintiffs maintain that the placement at MCA met Travis's needs because it was a "quiet" school, with smaller classes and a better, more attentive teacher. As proof of "educational benefit," plaintiffs reported that Travis was getting better grades, had finally learned his "math facts," and was reading at a fourth-grade level. Academic results have been recognized as an important factor in determining whether an IEP is reasonably calculated to provide educational benefits. *See Defendant I*, 898 F.2d at 1191 (quoting *Rowley*, 458 U.S. at 207 n.28); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 991 (1st Cir. 1990). Nonetheless, evidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA. *Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 33 (1st Cir. 2001).[6] Nor are parents entitled to reimbursement

---

[5]Plaintiffs' initial claim of error, that the private placement was rejected for failure to satisfy statutory requirements, completely misreads the district court's rationale on this issue.

[6]The district court observed that if educational progress was determinative, reimbursement would depend on the "mere happenstance" of whether the child "did well" in a private placement, which could mean the denial of reimbursement for even specialized educational programs for disabled students if the child did not show academic results. This would

for private school just because the private placement is less restrictive than the public school placement. *See Milford Sch. Dist. v. William F.*, No. 97-1506, 1997 WL 696108, at **6 (1st Cir. Nov. 10, 1997) (unpublished disposition) ("Even if the private school was less restrictive, it would still have to be a placement deemed appropriate by an authorized decision maker in terms of educational benefit.").[7]

The crux of the district court's decision on this issue, like those of the administrative hearing officers in this case, was the fact that MCA did not provide Travis with any of the special education services he needed; in particular, neither the speech and language therapy that he undeniably needed, nor the pre-tutoring services that were found to be lacking at Heritage Elementary. MCA declined to apply for "flow through" funds that could be used to provide special education services for Travis, and plaintiffs arranged for his speech and language therapy outside school and provided pre-tutoring at home.

On appeal, plaintiffs suggest that pre-tutoring was only recommended to overcome problems caused by the "structurally flawed environment" at Heritage Elementary. On the contrary, Dr. Flexer testified that pre-tutoring was an essential service for most hearing-impaired students and is required to remedy problems they have with auditory-cognitive closure. Moreover, after visiting Heritage, the IHO specifically found both that the classroom setting was "relatively quiet" and that the FM system was intended to overcome ambient noise.

not be consistent with the purposes of the IDEA.

[7]Conversely, we have held that the fact that private school placement is more restrictive will not bar parents from receiving reimbursement under *Burlington* and *Carter*. *See Knable*, 238 F.3d at 770; *Cleveland Heights-Univ. Heights Sch. Dist. v. Boss*, 144 F.3d 391 (6th Cir. 1998).

We agree with the IHO's assessment that although nothing in *Carter* or *Burlington* indicates that a private school must be readily identifiable as a "special education placement," a unilateral private placement cannot be regarded as "proper under the Act" when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient. *See In re Owen J. Roberts Sch. Dist.*, 29 IDELR 742 (SEA Pa. 1998) (administrative appeal denying reimbursement for private school offering small class sizes, but no special education services). It must be kept in mind that retroactive reimbursement is an equitable remedy for the failure of the public school to provide a FAPE to a disabled student. *Burlington*, 471 U.S. at 371-74. As such, a private school placement must be consistent with the purposes of the IDEA. *See Gillette v. Fairland Bd. of Educ.*, 932 F.2d 551, 554 (6th Cir. 1991) ("Removing a child from a partially mainstreamed program at a public school, which otherwise provides an appropriate academic instruction and the only objection to that program was a failure to fully mainstream, and placing that child in a non-mainstreamed program in a private school does not satisfy the goals of the Act.")

We agree with the district court that the placement MCA offered to Travis, although apparently a good education, was not "proper under the IDEA." As such, plaintiffs were not entitled to reimbursement under *Carter*.

## B. Notice to Defendant

The district court also denied plaintiffs' request for reimbursement for the separate and independent reason that plaintiffs failed to inform defendant that they objected to the IEP before removing Travis from the public school. Even before the IDEA was amended to explicitly require such notice, this court held that dissatisfied parents were required to complain to the public school to afford the school a chance to remedy the IEP before removing their disabled child from

the school. *See Wise v. Ohio Dept. of Educ.*, 80 F.3d 177, 185 (6th Cir. 1996); *Hines v. Tullahoma City Sch. Sys.*, No. 97-5103/04, 1998 WL 393814 (6th Cir. June 15, 1998) (unpublished disposition). As amended, however, the IDEA provides that reimbursement for a private school placement may be reduced or denied if parents did not provide notice, either at the most recent IEP meeting prior to removal, or in writing 10 business days prior to removal of the child from the public school, "that they were rejecting the placement proposed by the public agency to provide a [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa) (effective June 4, 1997).

The administrative decisions in this case denied reimbursement in reliance on *Wise* and *Hines*, while the district court found plaintiffs had not complied with § 1412(a)(10)(C)(iii). The record is clear that at the conclusion of the May 1999 IEP team meeting, plaintiffs signed the IEP indicating their agreement with the decision to promote Travis to fifth grade and place him in the resource room for part of the day. Plaintiffs admitted during the due process hearing that they did not inform the IEP team at the May 1999 meeting either that they rejected the placement, or that they intended to enroll Travis in a private school.

Plaintiffs argue that the July 23, 1999 letter requesting a due process hearing constituted written notice that satisfied the statute because Travis was not officially removed until more than 10 days later. The evidence showed, however, that plaintiffs arranged to enroll Travis at MCA before requesting the due process hearing or advising defendant of its specific objections and intent to remove their child from public school. Not only did the letter demonstrate that plaintiffs were removing Travis from the public school, but their subsequent rejection of the offer to either have another meeting or engage in mediation through the Department of Education confirmed it. We are not persuaded by the

assertion that Travis was not removed from the public school until plaintiffs sent a letter to the principal in late August 1999, stating that Travis would not be attending Heritage Elementary. We are satisfied that the district court did not err in finding that plaintiffs failed to provide the notice required by the IDEA.

In apparent reliance on the exceptions to the notice requirement, plaintiffs claim an absence of proof in the record that they ever received information regarding the 1997 amendments.[8] The district court found that the proper procedure for withdrawing a student, as well as the limitations on reimbursement, were described in a pamphlet entitled "Whose IDEA is This?" Plaintiffs admitted to having received the pamphlet and did not deny receiving a version that included information about the 1997 amendments. In fact, Mrs. Berger testified that they received a new copy of the pamphlet at the beginning of every school year. The pamphlet that was distributed at the beginning of the 1998-1999 school year would have included the addendum with the relevant information. We find no error in the district court's decision to deny reimbursement for failure to provide notice as required by the IDEA.[9]

---

[8] The IDEA does not require parents to meet the notice requirement if one of the following exceptions applies: "(I) the parent is illiterate and cannot write in English; (II) compliance . . . would likely result in physical or serious emotional harm to the child; (III) the school prevented the parent from providing such notice; or (IV) the parents had not received notice . . . of the notice requirement in clause (iii)(I)." 20 U.S.C. § 1412(a)(10)(C)(iv).

[9] We need not address the district court's further finding that plaintiffs' refusal to engage in mediation provided an independent basis for denying their request for reimbursement under 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (Reimbursement may also be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents.").

In a final argument, plaintiffs strenuously argue that their failure to give notice required by the statute should be excused by defendant's failure to comply with other technical requirements of the IDEA.  Those alleged violations, making placement decisions outside the IEP process and failing to give plaintiffs prior notice of the intention to change Travis's educational placement, will not relieve plaintiffs of the requirement that they provide notice under the statute of their intention to unilaterally withdraw Travis.

As for the claim that defendant made placement decisions outside the IEP process, plaintiffs have not shown it was clear error to find that there was an IEP and that the May 1999 meeting was an IEP meeting.  More importantly, the fact that school personnel conferred informally before the May 1999 meeting, formulated opinions, and came to the meeting with recommendations concerning Travis's placement for the following year does not demonstrate either a violation of the IDEA, or "serious infringement" of plaintiffs' right to participate in the IEP meeting.  *N.L. v. Knox County Schs.*, 315 F.3d 688, 692 (6th Cir. 2003) (applying *Burilovich*, 208 F.3d at 568-69).

Next, plaintiffs correctly observe that the IDEA requires that parents be provided prior written notice whenever the school district proposes or refuses to initiate or change the educational placement of the child.  *See* 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503.  Without determining whether or not this provision was in fact violated, the district court found that no substantive harm to plaintiffs' ability to participate meaningfully in the IEP meetings resulted.  As such, any technical violations were also found insufficient to excuse the parents' obligation to complain before unilaterally withdrawing from the public school.  While we agree with this assessment, close examination of the case law relied on by plaintiffs reveals that those cases actually address the first *Rowley* prong, whether the procedural violations denied the child a FAPE, and do not hold that reimbursement may be

ordered without regard to either the appropriateness of the private placement or the parents' own violations of the IDEA's notice requirement.

Particularly telling is the decision in *Hall v. Vance County Board of Education*, 774 F.2d 629 (4th Cir. 1985), in which the court found the parents' failure to initiate proceedings was a direct result of the public school's noncompliance with procedural safeguard requirements of the IDEA.  Consequently, the procedural violations themselves were found sufficient to establish a failure to provide a FAPE under *Rowley*.  *Id*. at 635.  In a footnote, the court took care to note there was no question that the private placement was appropriate. *Id*. at 636 n.7.  *See also Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 589 (9th Cir. 1992) (addressing procedural violations and approving district court's opinion, which specifically found the private placement was "proper under the Act"); *Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 109 (6th Cir. 1992) (as a direct consequence of failure to adhere to procedural requirements, child deprived of an IEP).

Plaintiffs rely on the statement that "reimbursement after a unilateral placement can be appropriate, upon a finding of sufficiently serious procedural failures by the school district." *Doe v. Metro. Nashville Pub. Sch.*, 133 F.3d 384, 388 (6th Cir. 1998) (violation of "child find" obligations).  That statement, however, was supported by citation to both *Hall* and *Ash*.  Also, the court reversed summary judgment on the question of the impact of the defendant's procedural violations without indicating that any challenge had been made to the private placement.  *See also Tenn. Dep't of Mental Health v. Paul B.*, 88 F.3d 1466, 1475 & 1478 (6th Cir. 1996) (question of fact existed whether failure to give notice of proposed change in placement caused ambiguous statements at the IEP meeting to mislead the parents about what decision was being made at that time).  These cases do not stand for the proposition that the parents' failure to comply with the notice requirement in the statute may be

excused by demonstrating a school's violation of procedural requirements under the IDEA.

## C. Attorney Fees

Plaintiffs may be considered "prevailing parties" for purposes of attorney fees "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The "touchstone" of this inquiry is "the material alteration of the legal relationship of the parties." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989). The IDEA provides that a court, "in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B) (formerly 20 U.S.C. § 1415(e)(4)).

It is clear that both the administrative proceedings and this lawsuit were brought to recover the cost of educating Travis at the private school for the 1999-2000 school year. Having determined that plaintiffs were not entitled to reimbursement, the district court found plaintiffs were not "prevailing parties" eligible for attorney fees under the IDEA. Plaintiffs maintain they were prevailing parties by virtue of their success in demonstrating that defendant failed to provide Travis with a FAPE. That finding, while favorable to plaintiffs, does not constitute success on a significant issue in this litigation.

Plaintiffs' heavy reliance on *Krichinsky v. Knox County Schools*, 963 F.2d 847 (6th Cir. 1992), is misplaced as it is easily distinguished from the case at bar. There, the parents contested the IEP and sought to force the school to place their child in a residential facility, but did not remove him from the school. As a result, even though the parents did not succeed in forcing a change to residential placement, they were found to have succeeded on two significant issues because they convinced the court to order defendant to provide their child

increased speech and occupational therapy. *Id*. at 850. We find no error in the district court's determination that plaintiffs were not prevailing parties eligible for attorney fees under the IDEA.

**AFFIRMED**.