# Illinois Official Reports

## Appellate Court

*Jenna R.P. v. City of Chicago School District No. 229*, 2013 IL App (1st) 112247

| | |
|---|---|
| Appellate Court Caption | JENNA R.P. and E. SCOTT P., as her Guardian and Next Friend, Plaintiffs-Appellants, v. THE CITY OF CHICAGO SCHOOL DISTRICT NO. 229 and THE ILLINOIS STATE BOARD OF EDUCATION, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-2247 |
| Filed | December 31, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action filed pursuant to the Individuals with Disabilities Education Act, the trial court's order upholding a hearing officer's decision denying the request of plaintiff and her father for reimbursement of her tuition and the expenses for her placement in a private boarding school was reversed by the appellate court and the cause was remanded for a determination of the appropriate amount of reimbursement, since defendant school district refused to convene a meeting on an individualized education program for the child where the plaintiff father could express his concerns, and the hearing officer erred as a matter of law as to the proper factors to be considered in determining whether reimbursement would be proper. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-22880; the Hon. Mary L. Mikva, Judge, presiding. |
| Judgment | Reversed and remanded, with directions. |

Counsel on Appeal

Eric S. Palles, of Ravitz & Palles, P.C., of Chicago, for appellants.

Patrick J. Rocks and Lee Ann Lowder, both of Board of Education Law Department, of Chicago, for appellees.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Lampkin concurred in the judgment and opinion.
Justice Reyes specially concurred in part and dissented in part, with opinion.

## OPINION

¶ 1    Plaintiffs, Jenna R.P. (Jenna) and E. Scott P. (Scott), as her guardian and next friend, appeal an order of the circuit court of Cook County which found in favor of defendants City of Chicago School District No. 229 (District) and the Illinois State Board of Education (Board), denying plaintiffs reimbursement of Jenna's tuition and expenses for her placement at a private boarding school. For the following reasons, we reverse.

¶ 2                                BACKGROUND

¶ 3    Plaintiffs filed this lawsuit pursuant to the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400 *et seq.* (2006)) and the Illinois School Code (School Code) (105 ILCS 5/14-1.10 (West 2008)). A brief description of the statute will aid in understanding this litigation. The purpose of IDEA is to provide all children with disabilities with a free appropriate public education. 20 U.S.C. § 1400(d)(1)(A) (2006). One of the primary tools to further this objective is the individualized education program (IEP). The IEP is a "written statement for each child with a disability," which describes the child's present levels of achievement and performance, the child's measurable annual goals, and the special education and related services to be provided to the child. 20 U.S.C. § 1414(d)(1)(A) (2006). The IEP is developed by an "IEP Team," which ordinarily must include the child's parents, a regular education teacher, a special education teacher, and a representative of the local educational agency. 20 U.S.C. § 1414(d)(1)(B) (2006). IDEA provides parents challenging an IEP with comprehensive procedural safeguards, including the right to an impartial due process hearing. 20 U.S.C. §§ 1415(f), (g) (2006). Any party aggrieved by the findings and decision made by the state educational agency has the right to file a civil action with respect to the complaint presented pursuant to section 1415 in a federal district court or a state court of competent jurisdiction. 20 U.S.C. § 1415(i)(2) (2006). The complaint in this case was filed in the circuit

court of Cook County pursuant to section 1415(i)(2).

¶ 4                                I. Jenna's Childhood Education

¶ 5      The record on appeal here, consisting primarily of the testimony and other evidence adduced at the due process hearing before the Board, discloses the following facts. In 1989, Jenna was adopted at birth by Scott and Rona S. (Rona). According to Scott, he and Rona separated when Jenna was three or four years old. Jenna's toilet training at 3½ years old included behavior modification treatment.

¶ 6      Jenna attended kindergarten and first grade at a private school named North Shore. She transferred to start the second grade at Near North Montessori, another private school. Jenna initially had trouble making new friends at the new school.

¶ 7      According to Scott, Jenna was molested from ages six to eight by a neighbor approximately five years older. Jenna's parents divorced in 1997, when she was approximately nine years old. Scott testified the divorce became acrimonious in 2000 and Jenna suffered as a result. In October 2001, when Jenna was almost 12 years old, her parents retained Dr. Heidi Hamernik, a neuropsychologist, because Jenna was temperamental and had difficulty maintaining friendships and interpreting social cues. According to Dr. Hamernik, Jenna had a verbal IQ in the average range and an above-average performance IQ. Dr. Hamernik opined that Jenna's greatest difficulties were "within the social-emotional arena." Dr. Hamernik did not diagnose Jenna with a major depressive disorder, but found her sad, anxious and despondent. Dr. Hamernik suggested Jenna's parents share her evaluation and recommendations for addressing Jenna's difficulties in organizing her thoughts, becoming caught up in details and forgetting to write down or turn in homework.

¶ 8      Jenna's grades deteriorated during her eighth-grade year at Near North Montessori, which was the 2003-04 academic year. Jenna received counseling from psychologist Lori Buckenberger between the ages of 13 and 15 years old. In June 2004, Dr. Buckenberger discussed with Jenna's parents the need to closely monitor Jenna's transition to high school "due to her history of poor academic follow through, poor organizational skills, and nonverbal learning disability." In February 2005, Dr. Buckenberger reported there had been no follow-up on any monitoring program for Jenna.

¶ 9                                II. Jenna at Lane Technical High School

¶ 10      In September 2004, Jenna began attending Lane Technical High School (Lane Tech). According to Scott, he and his ex-wife agreed that to assist the transition, Jenna would live with his ex-wife and visit him on alternate weekends. As the semester progressed, Jenna began failing some subjects and was teased by her basketball teammates. On one occasion, several girls pushed Jenna into the snow. Jenna's school attendance began to decline.

¶ 11      According to Scott, in February 2005, Jenna was cohabiting with a slightly older boy at her mother's house. Rona took Jenna to Children's Memorial Hospital to address the situation. While at the hospital, Jenna discussed a plan to hang herself. Jenna was then hospitalized in the psychiatric ward. Hospital clinicians were concerned Jenna was depressed and having

adjustment problems. The clinicians also opined that Jenna was developing a cluster of borderline personality traits, but did not diagnose her with personality disorder due to her age.

¶ 12 After Jenna was discharged from the hospital, Rona requested that Lane Tech evaluate Jenna to determine whether she qualified for special education. In March 2005, a Chicago Public Schools psychologist found Jenna's achievement fell at or above the ninth-grade level and her IQ was in the average to above-average range. According to Scott, he and Rona participated in the development of an IEP for Jenna in April 2005. The IEP reflects that Jenna had a primary disability of "emotional disturbance," but was also found to have a learning disability. The IEP contained strategies to reduce Jenna's academic stress by decreasing her course load and granting time in a special education resource room. Nevertheless, in her freshman year, Jenna accumulated 68 absences, failed 5 subjects and earned only 3½ academic credits of the 24 credits required for a diploma.

¶ 13 During Jenna's sophomore year, on December 8, 2005, Rona participated in an evaluation of Jenna's IEP. On that date, Jenna was receiving an "A" in world studies, a "C" in Italian, a "D" in music appreciation, and was failing geometry and American literature. The IEP was modified to include, among other items: extended time for tests, quizzes, projects, essays and research papers; a small group or resource room set for testing; test and homework modifications, as needed; allowance for calculator use; provision of class notes, as needed; and a modified grading scale. In addition, Jenna was assigned to a special education resource room for 450 minutes weekly, to assist her with time management, independent functioning and organizational skills. Further, a special education teacher was assigned to Jenna to provide accommodations for her in her general education geometry and earth science classes. Jenna was also scheduled for 60 minutes of social work weekly, to improve Jenna's self-esteem and help her develop positive attachments.

¶ 14 According to Scott, however, Jenna began receiving homebound tutoring based on her truancy problem. Jack Cox, a social worker at Lane Tech, testified Jenna received a minimal amount of homebound tutoring because she was not at home. Jenna accumulated 115 absences and received no academic credits. Her class ranking at the end of the 2005-06 academic year was 919 out of 926.

¶ 15 Jenna went missing in spring 2006. According to Scott, Jenna had later informed him she was living with a woman and her pimp. Jenna also said the pimp wanted to prostitute her, but she refused. Jenna further admitted she had once smoked crack cocaine. On May 2, 2006, Rona met with Jenna's IEP Team by telephone to revise the IEP. The IEP does not note Jenna was missing from home.

¶ 16 In May 2006, Rona notified Scott that Jenna had been missing for over one month. Scott hired a private investigator to find Jenna. After locating Jenna, Scott placed her in an inpatient psychiatric hospital, where the staff told him Jenna was severely depressed, oppositional and defiant, with a cluster of borderline personality traits. The hospital recommended long-term residential care.

¶ 17                                    III. Jenna at the Aspen Achievement Academy

¶ 18          On May 26, 2006, Scott decided to send Jenna to the Aspen Achievement Academy in Utah. He retained individuals otherwise employed as prison guards or correctional officers to escort Jenna to Utah. The academy is a wilderness-therapy program, in which adolescents are dropped off in the Utah desert and taught to survive in groups.

¶ 19          Jenna was given a psychological evaluation by Dr. Jeffrey D. Rush during her time in Utah. Dr. Rush's report refers to a number of traumatic events in Jenna's life, including her mother's illness, an alleged gang rape and a recent abortion. Dr. Rush diagnosed Jenna with dysthemic disorder, oppositional defiant disorder, post-traumatic stress disorder, cannabis dependence and a nonspecified learning disorder with a nonverbal learning disability and features of attention deficit hyperactivity disorder. Jenna also displayed symptoms of borderline personality disorder, although she was not diagnosed with such due to her age. Dr. Rush recommended Jenna be placed in a highly structured and supportive program to address her problems. Dr. Rush also recommended individual and family therapy for Jenna, as well as a substance abuse program.

¶ 20          Scott testified he reconciled with his daughter in Utah, but knew the academy was not a long-term solution. In early June 2006, Scott contacted Josephine Martinez, who was responsible for special education services at Lane Tech, for the purpose of arranging and financing long-term plans for Jenna when she left the academy in Utah. Martinez informed him the IEP Team could not be convened given the end of the school year, but to remain in contact to address these issues.

¶ 21                                    IV. Jenna at the Elan School

¶ 22          On July 14, 2006, Scott sent a 10-day notice[1] to Arne Duncan, then superintendent of Chicago Public Schools, advising of his intent to place Jenna at the Elan School in Portland, Maine (Elan), and to seek reimbursement from the District. Scott explained this decision was based on his desire to keep Jenna safe and sober, the inclusion of Elan on a list of Board-approved schools, cost, and Jenna's intelligence relative to the children at other institutions. On July 25, 2006, Louis Rodriguez, the director for due process and mediation for the Chicago Public Schools, wrote to Scott, notifying him the Chicago Public Schools would not fund Jenna's unilateral placement at Elan.

¶ 23          Jenna attended Elan from July 2006 through April 2009. Kate Hawkins, a social worker for Elan, testified the school provides a highly structured program for emotional and transitional problems. Elan students attend academic classes at night (with small class sizes) and participate in a life skills program during the day. According to Hawkins, Elan students also perform jobs at the school and are promoted to more interesting jobs if they are cooperative and diligent. Hawkins testified she conducted sessions with Jenna in which she learned Jenna put herself into various dangerous situations. However, Hawkins never conducted a formal evaluation or assessment of Jenna. According to Hawkins, Jenna left Elan on a positive note,

---

[1]Under IDEA, failure to submit this 10-day notice may result in a reduction or denial of reimbursement for enrollment in a private school. 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) (2006).

but did not reach the highest job level at the school. Hawkins also testified Jenna did not complete the program at Elan, but obtained a high school diploma from the state of Maine. The record further contains a May 8, 2008, letter from Hawkins to Lane Tech, noting prior interventions proved unsuccessful until Jenna was placed at Elan. Hawkins opined Jenna could not have been educated outside a very structured and supervised residential program like Elan.

¶ 24    Scott testified he was in family therapy with Jenna during her time at Elan, usually weekly. According to Scott, Jenna made academic progress at Elan and was accepted to attend college at Western Illinois University, Southern Illinois University, and Lewis University. Being accepted at Western Illinois University was significant because Jenna expressed an interest in forensic science. Elan's records for July 2007 show Jenna received high honors for all subjects, earning 100 in algebra, 98 in geometry, 98 in reading the classics, 98 in Spanish, 95 in United States history I and 94 in English III. Jenna had a "B+" average when she left Elan.

¶ 25                    V. Scott's Efforts to Return Jenna to Lane Technical High School

¶ 26    Meanwhile, on November 17, 2006, Scott contacted Lane Tech's case manager to request an evaluation of Jenna's placement at Elan. At a November 26, 2006, meeting of the IEP Team, representatives told Scott that Jenna would have to be evaluated by a psychologist chosen by the District. During the meeting, Scott also voiced his concerns about being able to afford Jenna's placement at Elan.[2] Meeting notes indicate: "Due to his decision being unilateral, likelihood of CPS reimbursement for [Jenna's] residential school in Maine is not predicted to be granted (team discussed post-meeting with father)."

¶ 27    On February 28, 2007, after a dispute regarding whether Jenna should return to Chicago for a psychological evaluation, Scott provided the District with the names of two psychologists in Maine, including Dr. Greggus Yahr. On April 27, 2007, the District agreed to pay Dr. Yahr to evaluate Jenna. Notes from the April 27 meeting indicate a 90-day observational period was required to assist the District in assessing the least restrictive environment for educating Jenna. On May 17, 2007, Scott signed the consent forms for Dr. Yahr's evaluation.

¶ 28    On January 17, 2008, Lane Tech's then-case manager and special education teacher Lauren Osada contacted Dr. Yahr, who promised to contact Osada after visiting Elan the following week. Dr. Yahr, however, did not place a follow-up telephone call. Osada telephoned Dr. Yahr again on February 11, 2008, but Dr. Yahr did not return the call. On April 8, 2008, Dr. Yahr informed a District psychologist his computer crashed in November 2007 and he also believed he had transmitted his report on Jenna by facsimile long ago. On April 31, 2008, Dr. Yahr sent the District a summary report, noting Jenna's difficulties were emotionally based, not cognitively based. Dr. Yahr diagnosed Jenna as meeting the criteria for a student with an emotional disability, due to her inability to self-regulate, depression in situational remission, and characteristics of borderline personality disorder. Dr. Yahr opined the appropriate setting

---

[2]The record on appeal does not appear to disclose the cost of annual tuition at Elan or a specific amount plaintiffs seek as reimbursement. During oral argument, plaintiffs' counsel provided a general estimate of $100,000.

for Jenna would be one where she is unable to avoid her emotions or the situation and remains accountable for her behavior.

¶ 29    On February 11, 2009, the District notified Jenna and Scott of a March 6, 2009, conference at Lane Tech to review and revise Jenna's IEP and to consider transition services. Lane Tech case notes suggest the conference was delayed because Cox (Lane Tech's social worker) had difficulty speaking to Jenna at Elan and the IEP Team needed Jenna's updated medical records. On March 11, 2009, Scott left a voicemail at Lane Tech, stating he was running out of money and demanding a decision regarding Jenna's placement. On March 12, 2009, Jenna completed a transition planning questionnaire about her grades and activities at Elan, as well as her plan to live with Scott until she attended Western Illinois University in September 2009.

¶ 30    On March 13, 2009, the IEP Team held a meeting regarding Jenna's placement, which Jenna attended via conference call. The IEP Team noted Jenna had 22.75 credits from Elan and had been on Elan's honor roll for the prior two years. The IEP Team listed necessary accommodations for Jenna and steps to assist Jenna's transition to college. Jenna's revised IEP called for Jenna to boost her word processing and computer skills to prepare for her goal of becoming a forensic scientist. Jenna was also scheduled to receive 30 minutes of weekly social work consultation to address her distractibility, cognitive distortions and coping mechanisms.

¶ 31    The revised IEP also called for Jenna to take biology, social science, Spanish II, driver's education, music, art, and computer informational technology courses in general education classrooms at Lane Tech for 80% of the school day. The IEP Team rejected Scott's request for residential placement for Jenna. The team concluded supportive services in a special education room for 20% of the school day would meet Jenna's needs.

¶ 32                              VI. The Due Process Hearing

¶ 33    On March 27, 2009, Scott requested a due process hearing before the Board, which was not held until January 19, 2010. At the hearing, the Board's hearing officer received the aforementioned testimony and evidence. In addition, Scott testified Jenna returned to Chicago on April 6, 2009, and regressed to her prior high-risk behaviors within three weeks of her return. Cox opined Jenna's educational needs could be met at Lane Tech with related services provided 20% of the school day. Cox also recommended 275 minutes of social work monthly, which was more than most students he saw were provided. Osada testified Lane Tech offered special education classes across the spectrum, including self-contained instructional classes for more severe cases. Both Cox and Osada concurred with the March 2009 IEP. David Yaffe, a special education teacher and Lane Tech's then-current case manager, also concurred with the March 2009 IEP.

¶ 34    On January 29, 2010, the Board's hearing officer entered an order denying reimbursement for Jenna's placement at Elan. The hearing officer ruled the District had denied Jenna a free appropriate public education. The hearing officer also ruled the District failed to carry its burden of proving Jenna's IEP was appropriate, given the overwhelming testimony that Jenna needed a small teacher-pupil ratio in a highly structured setting. Yet the hearing officer further ruled Scott failed to carry his burden of showing his placement of Jenna with Elan was appropriate. The hearing officer observed Jenna's problems stemmed from parental

management issues and it was not necessarily the school's duty to provide residential placement for a chronic runaway based on psychological reasons unrelated to the school.

¶ 35     In the hearing officer's view, however, Scott's chief problem was in failing to demonstrate he placed Jenna in the least restrictive environment, given IDEA's mandate that disabled students be educated alongside nondisabled students to the maximum extent appropriate. The hearing officer found Cox and Osada seemed to suffer from selective memory regarding questions to which they might be expected to know the answers. Nevertheless, giving due weight to the opinions of District staff that they could have provided a free appropriate public education to Jenna, the hearing officer opined that providing Jenna with a free appropriate public education in the least restrictive environment would have meant placing Jenna in a self-contained, instructional classroom at Lane Tech, to benefit from a lower teacher-to-pupil ratio, with more structure and certified staff, or a private day school if that program failed. Given these conclusions, the hearing officer declined to rule on the District's claim that Scott made his request for a due process hearing beyond the relevant limitations period in IDEA.

¶ 36                              VII. The Circuit Court Proceedings

¶ 37     On May 27, 2010, plaintiffs filed a complaint in the circuit court of Cook County to contest the findings and decision of the Board.[3] On August 6, 2010, the District and the Board filed their answer, along with the administrative record. In January 2011, plaintiffs moved for summary judgment. In February 2011, defendants filed a cross-motion for summary judgment.

¶ 38     On May 27, 2011, the circuit court entered a memorandum opinion and order in favor of the District and the Board. The circuit court agreed with the Board that the District denied Jenna a free appropriate public education. The circuit court also agreed with plaintiffs that the Board's hearing officer misapplied the requirement of educating Jenna in the least restrictive environment in this case. The circuit court nevertheless concluded when it "focused more broadly on whether this was an appropriate placement under the IDEA, and whether [Scott's] actions were 'reasonable' under the statute, *** reimbursement is not required." The circuit court ruled Scott's unilateral placement of Jenna with Elan "was certainly a 'reasonable' response to Jenna's myriad of issues, [but] went beyond concerns relating to her education." The circuit court noted Scott testified he placed Jenna at Elan mainly out of concern for her safety and security. The circuit court further ruled IDEA does not contemplate reimbursement

_____

[3]Under the School Code, the hearing officer shall issue a written decision, including findings of fact and conclusions of law, within 10 days after the conclusion of the due process hearing. 105 ILCS 5/14-8.02a(h) (West 2010). "Any party to an impartial due process hearing aggrieved by the final written decision of the impartial due process hearing officer shall have the right to commence a civil action with respect to the issues presented in the impartial due process hearing." 105 ILCS 5/14-8.02a(i) (West 2010). Thus, the decision of the hearing officer is not reviewed by the Board prior to judicial administrative review.

- 8 -

for a placement where the student's problems are largely behavioral. Accordingly, the circuit court affirmed the decision of the Board's hearing officer denying reimbursement.[4]

¶ 39    Plaintiffs filed a motion to reconsider. On July 6, 2011, the circuit court entered an order denying reconsideration, but clarifying the circuit court did not find Scott was aware of the July 25, 2006, letter from Rodriguez objecting to Jenna's placement with Elan before Scott transported Jenna to Elan. On August 3, 2011, plaintiffs filed a timely notice of appeal to this court.

¶ 40                                    ANALYSIS

¶ 41    On appeal, plaintiffs argue they are entitled to reimbursement for Jenna's placement at Elan, and for the following reasons we agree. We first set forth the standard of review and the statutory framework in IDEA cases.

¶ 42                            I. Standard of Review

¶ 43    Review of an administrative agency's factual findings is limited to determining whether the agency's findings of fact were against the manifest weight of the evidence, while questions of law are reviewed *de novo*. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). "An administrative agency's factual determinations are contrary to the manifest weight of evidence where the opposite conclusion is clearly evident." *City of Belvidere*, 181 Ill. 2d at 204. In contrast, "an agency's decision on a question of law is not binding on a reviewing court." *City of Belvidere*, 181 Ill. 2d at 205. Illinois courts, however, grant some deference to the agency's expertise where it resolves a genuine ambiguity in a statute or regulation it is charged with administering. *Department of Central Management Services/The Department of Public Health v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 110013, ¶ 51.

¶ 44                          II. The IDEA Framework

¶ 45    IDEA "was intended to ensure that children with disabilities receive an education that is both appropriate and free." *Florence County School District Four v. Carter*, 510 U.S. 7, 13 (1993).[5] As defined in IDEA, a "free appropriate public education" includes both "special education" and "related services." 20 U.S.C. § 1401(9) (2006). Special education must be specially designed instruction to suit the needs of the disabled child. 20 U.S.C. § 1401(29) (2006). Related services include:

> "[T]ransportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services,

---

[4]The circuit court, like the hearing officer, declined to reach the issue of whether plaintiffs' claim fell outside the limitations period provided in IDEA.

[5]Defendants do not dispute Jenna is a "child with a disability" within the meaning of the IDEA. 20 U.S.C. § 1401(3)(A) (2006).

psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C. § 1401(26)(A) (2006).

¶ 46    The United States Supreme Court interpreted the predecessor to the IDEA as granting a court authority "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *School Committee of the Town of Burlington, Massachusetts v. Department of Education*, 471 U.S. 359, 369 (1985).

¶ 47    The IDEA essentially codifies the *Burlington* ruling:

"If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii) (2006).

When a public school system has defaulted on its obligations under IDEA, a private school placement is appropriate if the education provided by the private school is reasonably calculated to enable the child to receive educational benefits. *Carter*, 510 U.S. at 11-12; see also *Goldstrom v. District of Columbia*, 319 F. Supp. 2d 5, 8 (D.D.C. 2004) (parents may be reimbursed for private placement where public placement violated IDEA and private school placement is proper under IDEA). The decision to reject public education in favor of enrolling a child in private school, however, cannot be described as "reasonably calculated to enable the child to receive educational benefits" if the private school does not offer at least "some element of special education services in which the public school placement was deficient." (Internal quotation marks omitted.) *Berger v. Medina City School District*, 348 F.3d 513, 520, 523 (6th Cir. 2003). Retroactive reimbursement is an equitable remedy for the failure of the public school to provide a free appropriate public education to a disabled student; thus, a private school placement must be consistent with the purposes of IDEA. *Berger*, 348 F.3d at 523. To allow reimbursement where the services offered by the public school are not deficient would entitle parents of disabled students, at public expense, to seek any alternative school they wish if the public education is inadequate. *Mr. I. v. Maine School Administrative District No. 55*, 480 F.3d 1, 24 (1st Cir. 2007).

¶ 48    Moreover, reimbursement may be denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (2006).

¶ 49   This case involves a unilateral, full-time residential placement. Despite IDEA's preference for educating children with disabilities in the least restrictive environment (20 U.S.C. § 1412(a)(5) (2006)), the statute recognizes some disabled students need full-time care in order to receive an educational benefit. IDEA defines "special education" to include "instruction conducted in *** institutions." 20 U.S.C. § 1401(29)(A) (2006). Pursuant to regulations promulgated under the statute by the United States Department of Education, "[i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.104 (2007).

¶ 50   Nevertheless, the United States Supreme Court has ruled:

> "[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated [IDEA]." *Burlington*, 471 U.S. at 373-74.

The Supreme Court has since reiterated this point. *Carter*, 510 U.S. at 15; see *Doe v. Metropolitan Nashville Public Schools*, 133 F.3d 384, 387-88 (6th Cir. 1998) (and cases cited therein); *Goldstrom*, 319 F. Supp. 2d at 8 (and cases cited therein).

¶ 51                               III. The Decisions Below and Plaintiffs' Claims

¶ 52   In the case at bar, the hearing officer denied the father reimbursement because it found that his daughter could have been placed in a self-contained classroom at Lane Tech, with more structure and specially certified staff, which would have met her needs. The hearing officer's memorandum order, dated January 29, 2010, stated: "In the Hearing Officer's opinion, FAPE [free appropriate public education] and the LRE [least restrictive environment] would have meant placing Jenna in a self-contained, instructional classroom at Lane Tech, to benefit from a lower teacher to pupil ratio, with more structure and specially certified staff, and/or a private day school, if the self-contained instructional program did not work out for her."

¶ 53   Plaintiffs' primary argument on appeal is that, even assuming that the hearing officer's conclusion was correct, it is irrelevant, because the school system never offered Jenna such an alternative. The hearing officer and the circuit court both ruled the District denied Jenna a free appropriate public education, and defendants do not challenge those rulings on appeal. Moreover, defendants do not argue on appeal that plaintiffs were required to demonstrate Elan was the least restrictive environment for Jenna.

¶ 54                                          IV. Errors of Law

¶ 55   For the reasons explained below, the hearing officer erred as a matter of law, and thus we must reverse.

## A. Lack of a Request for an IEP Hearing

Federal courts considering the issue have ruled that an IEP should be evaluated as drafted. *R.E. v. New York City Department of Education*, 694 F.3d 167, 185-86 (2d Cir. 2012); see also *A.K. v. Alexandria City School Board*, 484 F.3d 672, 682 (4th Cir. 2007) ("In evaluating whether a school district offered a FAPE [free appropriate public education], a court generally must limit its consideration to the terms of the IEP itself.").

As a preliminary matter, we observe that we cannot ignore this rule in the case at bar because the father did not formally "reject or seek a hearing on the IEP in place when he placed" his daughter in a private school.

First, in June 2006, prior to placing his daughter in a private school, the father contacted Josephine Martinez, the person responsible for special education services at Lane Tech, where his daughter was enrolled, for the purpose of making long-term plans for her. After attending Lane Tech for her freshman and most of her sophomore years, the daughter had run away from home during the spring of her sophomore year. After the daughter was located, the father attempted in early June to make plans with the school. However, Martinez informed him that the IEP team could not be convened, since it was the end of the school year. Left with very little choice in terms of making prompt plans for the upcoming school year, the father in July sent a 10-day notice of his intent to place his daughter in a private school. 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) (2006) (to receive reimbursement, a parent must provide a 10-day notice of his intent to place his child in a private school). In light of his attempt to work with the school and the fact that he was told that the IEP team could not be convened, his failure to formally seek a change to the IEP does not provide us with a reason to ignore the rule.

Second, although a parent may be denied reimbursement if he failed to express his concerns at the most recent IEP meeting (20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa) (2006)), this notice requirement is excused if "the school prevented the parent from providing such notice" (20 U.S.C. § 1412(a)(10)(C)(iv)(I)(aa) (2006)). In the case at bar, the school prevented the father from expressing his concerns at an IEP meeting by refusing to convene one.

## B. Errors of Law

Since the hearing officer must evaluate the IEP as it existed, and not a hypothetical IEP that never existed, the officer erred as a matter of law. As we observed above, federal courts have held that an IEP should be evaluated as drafted. *R.E. v. New York City Department of Education*, 694 F.3d 167, 185-86 (2d Cir. 2012); see also *A.K. v. Alexandria City School Board*, 484 F.3d 672, 682 (4th Cir. 2007) ("In evaluating whether a school district offered a FAPE [free appropriate public education], a court generally must limit its consideration to the terms of the IEP itself.").

In the case at bar, the hearing officer concluded that the school district had denied Jenna a free appropriate public education and that the district had failed to carry its burden of proving that the daughter's existing IEP was appropriate. Nonetheless, the hearing officer denied the father reimbursement because the district *could have*, hypothetically, provided his daughter with an appropriate education.

¶ 64    Since prior courts have held that we must review what actually was, instead of what hypothetically could have been, we must reverse. There is good reason to review only an actual, as opposed to, a hypothetical IEP. As the Second Circuit Court of Appeals has explained, under the opposing view, "a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim"–every time–"with evidence that effectively amends or fixes the IEP." *R.E. v. New York City Department of Education*, 694 F.3d 167, 186 (2d Cir. 2012). We cannot countenance such a result.

¶ 65    Parents are not barred from reimbursement where a private school they choose does not meet the IDEA's definition of a free appropriate public education. *Frank G. v. Board of Education*, 459 F.3d 356, 364 (2d Cir. 2006) (citing *M.S. v. Board of Education of the City School District of the City of Yonkers*, 231 F.3d 96, 104 (2d Cir. 2000)).[6] 20 U.S.C. § 1401(9) (2006) (definition of a free appropriate public education). An appropriate private placement need not meet state education standards or requirements. *Frank G.*, 459 F.3d at 364 (citing *Florence County School District Four v. Carter*, 510 U.S. 7, 14 (1993)). For example, a private placement does not have to utilize certified special education teachers or develop an IEP for the disabled student. *Frank G.*, 459 F.3d at 364 (citing *Carter*, 510 U.S. at 14). In addition, parents may not be subject to the same mainstreaming requirements as a school board. *Frank G.*, 459 F.3d at 364 (citing *M.S.*, 231 F.3d at 105, citing *Warren G. v. Cumberland County School District*, 190 F.3d 80, 84 (3d Cir. 1999)).

¶ 66    "No one factor is necessarily dispositive in determining whether parents' unilateral placement is 'reasonably calculated to enable the child to receive educational benefits.' " *Frank G.*, 459 F.3d at 364 (quoting *Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 207 (1982)). See also *Carter*, 510 U.S. at 11. However, "a unilateral private placement cannot be regarded as 'proper under the [IDEA]' when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient." *Berger v. Medina City School District*, 348 F.3d 513, 523 (6th Cir. 2003). For example, a "small class size," such as in the classes provided to Jenna at Elan, can be "one element of the special education services" needed for a child. *Frank G.*, 459 F.3d at 365.

¶ 67    For purposes of the IDEA, the term "special education" means solely what the statute has defined it to mean: "specially designed instruction *** to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29) (2006). As a result of the plain language of the statute, a parent does not have to show that the school has a special education department, or special education teachers, or "every special service." *Frank G.*, 459 F.3d at 364-65 (affirming the award of reimbursement despite the school district's claim that the private school did not offer special education). See also *Carter*, 510 U.S. at 14 (a school's teachers do not have to be state certified). A parent must show only that the school provided specially designed instruction to meet the unique needs of his or her child. 20 U.S.C. § 1401(29) (2006). Proof may include

---

[6]Justice Sotomayor was on the panel for both of these Second Circuit cases: *Frank G.*, 459 F.3d 356, and *M.S.*, 231 F.3d 96.

evidence of the child's social and academic progress, including test scores. *Frank G.*, 459 F.3d at 366.

¶ 68    However, contrary to the plain language of the statute, the hearing officer in the case at bar stated the question that he had to answer as: "Did the Elan School Provide Jenna With FAPE [free appropriate public education] in the LRE [least restrictive environment]?" The officer concluded that "[c]learly Jenna made progress at Elan," and "[c]learly, in the case at issue, Jenna did well at the Elan Residential School," receiving excellent grades. See *M.S.*, 231 F.3d at 105 ("[a]n assessment of educational progress" is the type of judgment to which a court should defer to the hearing officer's judgment). However, the hearing officer denied reimbursement, stating: "The chief problem with the Petitioner's case is the failure to comport with an equally significant portion of the IDEA, namely, that placement be in the least restrictive environment (LRE)."

¶ 69    The hearing officer erred, as a matter of law, in the question that he posed. The United States Supreme Court held in *Carter* that parents seeking reimbursement did not have to prove that the school provided free appropriate public education. *Carter*, 510 U.S. at 13. The Court stated:

> "This case presents the narrow question whether Shannon's parents are barred from reimbursement because the private school in which Shannon enrolled did not meet the [IDEA's] definition of a 'free appropriate public education.' We hold that they are not, because [the definition's] requirements cannot be read as applying to parental placements." *Carter*, 510 U.S. at 13.

As a result, the hearing officer erred, as a matter of law, when he asked: "Did the Elan School Provide Jenna With FAPE ***?"

¶ 70    The hearing officer also erred, as a matter of law when he formulated the ultimate question he had to decide as whether "the Elan School Provide[d] Jenna With FAPE in the LRE [least restrictive environment]?" Like we do, the trial court also found that the hearing officer "focused exclusively on whether Elan met the LRE requirement," and it also found that this was an error as a matter of law, stating:

> "In denying reimbursement, the hearing officer focused exclusively on whether Elan met the LRE requirement embodied in the IDEA. While LRE is a consideration, parents are not subject to the same requirements as a school board in ensuring that a student is placed in the least restrictive alternative educational setting. [Citation.] Thus, this does not, in itself seem to this Court to be a basis for denying [Jenna's father] reimbursement."

Like the trial court, the Second Circuit has held that, although LRE is one factor that a hearing officer may consider, the same mainstreaming requirements that apply to a school district do not necessarily apply to a parent's private placement. *M.S.*, 231 F.3d at 105. Thus, while LRE may be one factor, a hearing officer errs when he makes LRE the ultimate test.

¶ 71    However, the Seventh Circuit has gone further than the Second Circuit and has held that, when a school district fails to provide a child with an adequate plan, the court is unable to determine whether the private placement is the least restrictive alternative because, at that

moment, it is "the only alternative." *Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1168 (7th Cir. 1994). The school district cannot be heard to complain because "this situation result[s] directly from the school district's failure to present a viable alternative." *Murphysboro*, 41 F.3d at 1168. As a result, the question is not whether the private school presented the least restrictive option but "simply" whether the parent's choice "provide[d] an appropriate education." *Murphysboro*, 41 F.3d at 1168.

¶ 72 The Sixth Circuit agrees that LRE drops out as a consideration when the school district has failed to provide a meaningful alternative. Rejecting a school district's argument that the parent's choice of a residential program "was the most restrictive option," the Sixth Circuit explained that, at that point, a court is "faced" with only "two options": "the school [district's] choice of inaction" or the parent's "choice of a residential program with counseling and educational services." *Babb v. Knox County School System*, 965 F.2d 104, 108 (6th Cir. 1992). The court's job is to "compar[e] these two options" and decide whether the parent's choice provided an appropriate education. *Babb*, 965 F.2d at 108.

¶ 73 Whether one adopts the trial court's view that the LRE can be one factor but not the exclusive test, or whether one adopts the view of the Sixth and Seventh Circuits that LRE drops out as a consideration once the school district fails to offer a viable alternative, one must still find that the hearing officer erred, as a matter of law, in making LRE the ultimate test. Due to these errors in law, we must reverse and remand for a determination of the appropriate amount of reimbursement.

¶ 74 V. The Limitations Period

¶ 75 Lastly, defendants argue plaintiffs' claim is barred by a limitations period specified in the School Code. Plaintiffs respond that defendants forfeited this issue by failing to plead it in the circuit court. The expiration of a statute of limitations is an affirmative defense, which is forfeited if not timely raised in the trial court. *Fox v. Heimann*, 375 Ill. App. 3d 35, 45 (2007). It is the duty of the party wishing to assert a limitations defense to raise it at the earliest possible time. *McKinnon v. City of Chicago*, 243 Ill. App. 3d 87, 92 (1993). A party who raises a statute of limitation defense for the first time on appeal may be deemed to have forfeited the defense. See *McKinnon*, 243 Ill. App. 3d at 92. Thus, we find, first, that this issue was waived for our review.

¶ 76 Second, for the reasons described below, even if we found that this issue was not waived, we would still find that it did not present a bar to plaintiffs' claims.

¶ 77 The School Code requires a request for a due process hearing to be "filed no more than 2 years following the date the person or school district knew or should have known of the event or events forming the basis for the request." 105 ILCS 5/14-8.02a(f) (West 2006); see also 20 U.S.C. § 1415(f)(3)(C) (2006) (two-year limitations period in the absence of state law to the contrary). This limitations period, however, does not apply where the local educational agency either specifically misrepresented that it resolved the problem forming the basis of the parent's complaint, or withheld information from the parent required to be provided under the statute.

20 U.S.C. § 1415(f)(3)(D) (2006).[7] For example, the notice of procedural safeguards required to be provided to parents or guardians of students with disabilities shall include information regarding the time period in which to make a complaint, the regulations governing due process hearings, and the availability of a civil action, including the time period for filing such actions. 20 U.S.C. § 1415(d)(2) (2006).

¶ 78     The appellate record discloses no record showing that the District provided notice of the limitations period to Scott before March 31, 2009. The appellate record demonstrates that the mother, Rona, received a copy of the notice of procedural safeguards that the District provides to parents and guardians of students with disabilities in December 2005. Yet the copy of the notice included in the appellate record does not refer to the two-year limitations period. Accordingly, the District has failed to demonstrate that the limitations period began to run before March 2009.

¶ 79     In addition, where a defendant's conduct constitutes a continuing violation of the IDEA, an action may be timely so long as the last act evidencing the continuing practice falls within the limitations period. *Jeffery Y. v. St. Marys Area School District*, 967 F. Supp. 852, 855 (W.D. Pa. 1997). In this case, the District failed to provide adequate notice of the limitations period and contributed to the delay in revising Jenna's IEP.

¶ 80     Thus, the two-year limitations period in the IDEA does not bar plaintiffs' action in this case since, first, the issue was waived and, second, the District failed to notify plaintiffs of the limitations period.

¶ 81                                    CONCLUSION

¶ 82     Due to the errors in law described above, we must reverse and remand for a determination of the appropriate amount of reimbursement.

¶ 83     Reversed and remanded, with directions.

¶ 84     JUSTICE REYES, specially concurring in part and dissenting in part.

¶ 85     The majority opinion, applying the standards typical of administrative review in Illinois to this appeal, concludes: (1) plaintiffs were not required to reject or seek a hearing on the IEP existing when Scott placed Jenna in the Elan school; and (2) the hearing officer committed reversible errors of law in denying reimbursement to the plaintiffs. I concur with the majority opinion's application of the standards typical of administrative review in Illinois to the hearing officer's decision in this case (see *supra* ¶ 43), its discussion of the IDEA framework (*supra* ¶¶ 45-50), and its focus on the issue of whether Jenna received "special education" as that term is understood in the context of the IDEA (*supra* ¶ 67). The majority opinion, however, in

_____

[7]Defendants' brief discusses various situations in which reimbursement may be reduced or denied, none of which appear to be germane to the limitations defense. See 20 U.S.C. § 1412(a)(10)(C) (2006). Defendants' arguments related to this provision of the IDEA are directed toward Jenna's participation in the Aspen Achievement Academy, but plaintiffs' request for reimbursement is limited to Jenna's placement at Elan.

imposing a one-sided rule limiting retrospective testimony in this case, and in reversing the decisions of the hearing officer and the circuit court denying reimbursement in this case, has otherwise misconstrued the record on appeal, the hearing officer's decision, and the relevant case law. Accordingly, I respectfully dissent from the remainder of the majority opinion.

¶ 86                              The Standards of Review in IDEA Cases

¶ 87        Although I concur with the majority opinion's application of the standards typical of administrative review in Illinois to this appeal, it should be noted that the IDEA establishes a procedure for judicial review in some respects similar to, but in other respects significantly different from, the typical procedures for reviewing the decision of an administrative agency under our Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2010)). The IDEA, for example, permits a party to request a court take additional evidence. 20 U.S.C. § 1415(i)(2)(C)(ii) (2006). More significant to this discussion, the IDEA provides the court is to base its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii).

¶ 88        Nevertheless, "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 206 (1982). At least one federal appellate court holds a virtually *de novo* review of the administrative decision is appropriate. See *R.P. v. Alamo Heights Independent School District*, 703 F.3d 801, 807 (5th Cir. 2012). The weight of authority, however, holds a less than *de novo* review, one similar to the typical standards of administrative review in Illinois, is appropriate. See, *e.g.*, *Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1166-67 (7th Cir. 1994); *C.C. v. Fairfax County Board of Education*, 879 F. Supp. 2d 512, 517 (E.D. Va. 2012) (and cases cited therein). The IDEA requires the reviewing court to receive the records of the state administrative proceedings, which "carries with it the implied requirement that due weight shall be given to these proceedings." *Rowley*, 458 U.S. at 206. Thus, when the court does not take new evidence and bases its review on the record compiled in the administrative proceedings, the court is required to give "due deference" to the administrative decision. *Dale M. v. Board of Education of Bradley-Bourbonnais High School District No. 307*, 237 F.3d 813, 815 (7th Cir. 2001). The level of deference due the administrative decision depends in part on whether the court is considering evidence not presented to the administrative hearing officer, with less deference due when new evidence is presented. See *id.* at 816.

¶ 89        In this case, the circuit court reviewed the administrative decision on the parties' cross-motions for summary judgment, which is not uncommon in IDEA litigation. See *id.* (and cases cited therein). The circuit court did not consider evidence outside the administrative record. Accordingly, I agree the hearing officer's decision is subject to the typical standards of administrative review in Illinois.

¶ 90        The IDEA also provides, however, that the district or circuit court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Accordingly, even in cases where a public school placement violated the IDEA, and the private school placement

was proper, the circuit court then must exercise its "broad discretion" and weigh "equitable considerations" to determine whether, and how much, reimbursement is appropriate. *Florence County School District Four v. Carter*, 510 U.S. 7, 15-16 (1993). The IDEA further specifies reimbursement may be denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III). The majority opinion acknowledges this aspect of the IDEA. *Supra* ¶ 48. A finding of unreasonableness will not be disturbed absent an abuse of discretion. See *S.W. v. New York City Department of Education*, 646 F. Supp. 2d 346, 363 (S.D.N.Y. 2009).

¶ 91    In this case, the circuit court's decision denying reimbursement was based in part on a judicial finding that Scott's decision to place Jenna in Elan may have been reasonable as a parenting decision, but his actions were not reasonable in the sense intended by the IDEA. The majority opinion does not address this finding, let alone explain how the circuit court abused its discretion in denying reimbursement on this basis. See *Maynard v. District of Columbia*, 701 F. Supp. 2d 116, 124-25 (D.D.C. 2010) (affirming finding parent acted unreasonably in part because she allowed the defendant school system less than one month to convene an IEP meeting and develop an IEP for the child during the summer before deciding to enroll the child in a private placement).

¶ 92                            Retrospective Testimony

¶ 93    The majority opinion concludes the hearing officer erred as a matter of law in considering the retrospective testimony regarding the services Lane Tech could have offered Jenna, rather than the IEP in place when Scott placed Jenna at the Elan school. The majority opinion relies on case law ruling an IEP should be evaluated as drafted. See *R.E. v. New York City Department of Education*, 694 F.3d 167, 185-86 (2d Cir. 2012) (and cases cited therein). A review of *R.E.*, however, demonstrates why a rule barring retrospective testimony is largely inapplicable to the circumstances presented in this appeal.[8] Moreover, a review of *R.E.* demonstrates how the majority opinion's application of the rule is unfair and skews the reimbursement proceedings in favor of the plaintiffs.

¶ 94    In *R.E.*, the Second Circuit considered three consolidated cases involving the private placement of autistic children. *Id*. at 174. In each case, the defendant's local committees on special education developed IEPs, which were rejected by the parents of the respective children, whereupon the parents filed a due process demand seeking tuition reimbursement for a private placement. *Id*. at 176, 178-79, 182. The court considered "when, if ever, is it permissible for a district to augment the written IEP with retrospective testimony about additional services that would have been provided at the proposed placement." *Id*. at 185. The Second Circuit held "testimony regarding state-offered services may only explain or justify

---

[8]The majority opinion also cites *A.K. v. Alexandria City School Board*, 484 F.3d 672, 682 (4th Cir. 2007). As the Fourth Circuit's decision relies on "the important policies served by the requirement of a formal written offer" (*id*.), the following discussion of *R.E.* is equally applicable to the rationale offered in *A.K.*

what is listed in the written IEP," but "may not support a modification that is materially different from the IEP." *Id*.

¶ 95        The reasoning of the Second Circuit in *R.E.* is not discussed in the majority opinion, but it is crucial to understanding the extent to which the rule it adopted should apply to this appeal. The Second Circuit looked to decisions of other federal courts holding the adequacy of an IEP should not be judged in hindsight. *Id*. at 185-86. In holding this rule should apply to due process hearings on tuition reimbursement, the *R.E.* court explained:

> "At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents." *Id*. at 186.

¶ 96        The Second Circuit also reasoned their rule does not unfairly skew the reimbursement hearing process. *Id*. at 187. The court noted the mutual nature of the rule, *i.e.*, parents "cannot later use evidence that their child did not make progress under the IEP in order to show that it was deficient from the outset." *Id*. The *R.E.* court further reasoned:

> "An important feature of the IDEA is that it contains a statutory 30-day resolution period once a 'due process complaint' is filed. 20 U.S.C. § 1415(f)(1)(B). That complaint must list all of the alleged deficiencies in the IEP. The [defendant] then has thirty days to remedy these deficiencies without penalty. If, at the end of the resolution period, the parents feel their concerns have not been adequately addressed and the amended IEP still fails to provide a FAPE, they can continue with the due process proceeding and seek reimbursement. The adequacy of the IEP will then be judged by its content at the close of the resolution period." *Id*. at 187-88.

The court additionally noted:

> "The parents must state all of the alleged deficiencies in the IEP in their initial due process complaint in order for the resolution period to function. To permit them to add a new claim after the resolution period has expired would allow them to sandbag the school district. Accordingly, substantive amendments to the parents' claims are not permitted." *Id*. at 187 n.4.

The Second Circuit concluded this resolution procedure eliminated the danger that parents could seek reimbursement based on alleged deficiencies in an IEP which the parents had not previously claimed were deficiencies. *Id*. at 188. In short, the *R.E.* court adopted a rule limiting retrospective testimony based on the reliance interested parents have in an existing or proposed IEP, which is in turn based on the existence of a statutory procedure for addressing parental complaints regarding that IEP.

¶ 97        In this case, the reasons for limiting retrospective testimony propounded by the Second Circuit are themselves limited. The majority opinion asserts Lane Tech prevented Scott "from expressing his concerns at an IEP meeting by refusing to convene one." *Supra* ¶ 60. This characterization of the record on appeal is not entirely accurate. The record establishes that in early June 2006, when Scott contacted Martinez for the purpose of arranging and financing long-term plans for Jenna, Martinez informed him the IEP Team could not be convened given

they were at the end of the school year, but to remain in contact to address these issues. Defendants did not completely foreclose any IEP meeting regarding the 2007-08 school year.

¶ 98        Moreover, even assuming *arguendo* that defendants refused to convene an IEP meeting in response to Scott's informal telephonic request, plaintiffs' concerns regarding reimbursement necessarily related to the 2006 IEP. Yet plaintiffs did not avail themselves of the legally required procedures for lodging a complaint regarding the provision of a FAPE to Jenna under the 2006 IEP prior to placing Jenna at the Elan school. Had plaintiffs sought a speedy resolution of their concerns, they could have legally forced defendants to either address their specific concerns regarding the 2006 IEP or proceed to the issue of tuition reimbursement. Instead, Scott chose to work with defendants regarding the formulation of a new IEP for Jenna–a process which, for a variety of reasons potentially attributable to both sides–extended from November 2006 through March 2009.

¶ 99        Plaintiffs did not file a due process complaint until after the formulation of the March 2009 IEP. Although the filing of the due process complaint is undisputed, neither plaintiffs nor defendants have identified where the due process complaint appears in the record or discuss any specific objections to the March 2009 IEP. The District's prehearing disclosure statement asserts the due process complaint failed to specify which aspects of the March 2009 IEP were inappropriate for Jenna's needs. Indeed, absent the due process complaint, this court is also not informed of the particular objections to the 2006 IEP, beyond plaintiffs' demand for reimbursement.

¶ 100       Based on the record here, the only possible reliance interest Scott could have is in the March 2009 IEP. That reliance interest, however, would not extend to reimbursement for Jenna's placement at Elan prior to March 2009. As Scott had no reliance interest in the 2006 IEP and plaintiffs chose not to avail themselves of the formal procedures for challenging the 2006 IEP, the Second Circuit's reasoning for limiting retrospective testimony in *R.E.* does not apply to the bulk of the complaint in this case.

¶ 101       Furthermore, the majority opinion fosters a form of the unfairness the *R.E.* court was careful to avoid. The adequacy of the IEP can only be determined as of the time it is offered to the student, not at some later date. See *Rowley*, 458 U.S. at 206-07; *R.E.*, 694 F.3d at 187; *Fuhrmann v. East Hanover Board of Education*, 993 F.2d 1031, 1039-40 (3d Cir. 1993). Under the majority opinion, however, all a parent is procedurally required to do in order to obtain tuition reimbursement is express his or her concerns informally by telephone and file the statutorily required 10-day notice. A parent then may wait years to lodge a formal complaint raising concerns which may have been possible to address previously, but which may be impossible to address at a later time. In the ensuing due process proceedings, the majority opinion bars the school from introducing evidence regarding what it may have done to respond to a timely formal complaint, while permitting the parent to rely on the child's prior lack of progress to attack a years-old IEP.[9] There is nothing in the Second Circuit's carefully reasoned

---

[9]Indeed, the hearing officer's ruling that the March 2009 IEP was inadequate is largely based on Jenna's prior lack of progress at Lane Tech. If the hearing officer had been aware this court would

opinion in *R.E.* justifying this unfair application of the rules of evidence. See *R.E.*, 694 F.3d at 186-88.

¶ 102                                    The Hearing Officer's Decision

¶ 103        As previously noted, I concur with the majority opinion insofar as it holds the traditional standards of administrative review apply to the review of the hearing officer's decision in this case. Accordingly, we do not review the propriety of the reasoning underlying the decision; rather, we review the decision itself. *Boaden v. Department of Law Enforcement*, 267 Ill. App. 3d 645, 652 (1994). Indeed, this court can affirm an administrative decision for any reason the record discloses, regardless of whether the decision relied on that reason. See, *e.g.*, *Department of Central Management Services (State Police) v. Illinois Labor Relations Board, State Panel*, 382 Ill. App. 3d 208, 221 (2008) (and cases cited therein); see *Gernand v. Illinois Commerce Comm'n*, 286 Ill. App. 3d 934, 943 (1997) (rule permitting this court to search the record to affirm, regardless of whether the basis was relied upon by the trial court and regardless of whether the reason given was correct, applies to administrative review).

¶ 104        The majority opinion holds the hearing officer erred as a matter of law in stating the question he had to answer was: " 'Did the Elan School Provide Jenna With FAPE [in the LRE]?' " *Supra* ¶ 69. I concur that the services provided by the Elan school are not legally required to meet the statutory definition of a FAPE. See *Carter*, 510 U.S. at 13. The majority opinion's analysis of the issue effectively ends here, without determining whether the decision is otherwise correct.

¶ 105        Despite its initial statement of the issue, the hearing officer's decision never faults the Elan school's services for failing to meet the statutory definition of a FAPE. Instead, the hearing officer wrote:

> "In determining whether a parent's unilateral placement is reasonably calculated to enable the child to receive educational benefits, the court must look at the totality of the circumstances, including, but not limited to, grades, test scores and regular advancement. *Gagliardo v. Arlington Central School District*, 489 F.3d 105 (2d Cir. 2007)."

The relevant passage in *Gagliardo* relies on *Frank G. v. Board of Education*, 459 F.3d 356, 364-65 (2d Cir. 2006), and *M.S. v. Board of Education of the City School District of the City of Yonkers*, 231 F.3d 96, 104 (2d Cir. 2000). *Gagliardo*, 489 F.3d at 112 (and cases cited therein). The majority opinion similarly relies on *Frank G.* and *M.S. Supra* ¶¶ 67-68. As the hearing officer's subsequent references to a FAPE deal exclusively with the issue of whether Lane Tech provided one to Jenna, a careful reading of the hearing officer's decision suggests he in fact applied the same law as the majority opinion on this point.

¶ 106        A careful reading of the hearing officer's decision also establishes the majority opinion has misconstrued the hearing officer's discussion of the LRE. Like the circuit court, the majority

---

impose a rule limiting retrospective testimony, it is possible the officer would have reached a different conclusion on this issue.

opinion states the hearing officer " 'focused exclusively on whether Elan met the LRE requirement.' " *Supra* ¶ 70. The plain language of the hearing officer's decision establishes the contrary.

¶ 107       Although the hearing officer's decision states "[t]he chief problem with the Petitioner's case is the failure to comport with an equally significant portion of the IDEA, namely that placement be in the least restrictive environment," the decision proceeds to state:

> "Though parent's failure to place Jenna in the 'least restrictive environment' possible is not necessarily a bar to tuition reimbursement, it is a factor which the Hearing Officer may consider. *M.S. vs. Bd. of Educ.*, 231 F.3d [*sic*] 96, 102 (2000)."[10]

Thus, the hearing officer recognized he could not exclusively rely on the LRE factor.

¶ 108       The hearing officer's decision also establishes he did not, in fact, rely on the LRE factor as the sole reason for denying reimbursement in this case. When the hearing officer wrote the LRE was an "equally significant portion of the IDEA," he was comparing it to his prior discussion of the rule that:

> "Even where there is evidence of success, a Courts should not disturb a State's denial of IDEA reimbursement where, as here, the chief benefits of the private school would be preferred by parents of any child, disabled or not. See *Gagliardo*, above."

At this juncture, it is worth quoting the relevant passage from *Gagliardo*:

> "We finally add a word about the position a district court finds itself in where, as here, it is called upon to review a case in which parents have enrolled their disabled child in a private school, believing it to be the best thing for the child, and can point to their child's record of success at the school they chose. It is understandable that a district court would be receptive to parents under these circumstances; a child's progress is relevant to the court's review. But such progress does not itself demonstrate that a private placement was appropriate. See *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 522 (6th Cir. 2003) ('[E]vidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA.'); *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 26-27 (1st Cir. 2002) (same). Indeed, even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where, as here, the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not. A unilateral private placement is only appropriate if it provides 'education instruction

---

[10]Again, the hearing officer relied on the same case law as the majority opinion on this point. *Supra* ¶ 70. The majority opinion alternatively relies on case law holding a court cannot determine whether a private placement is the LRE where the school district fails to provide a child with an adequate plan. See *supra* ¶¶ 71-73. For the reasons already explained in discussing the admissibility of retrospective testimony, the majority opinion's reliance on the failure to provide a plan depends upon mistaking a request to defer an IEP meeting as a refusal to provide a plan and considering a parent's concerns expressed informally in a telephone call as the equivalent of the statutory procedures required by the IDEA.

*specifically* designed to meet the *unique* needs of a handicapped child.' *Frank G.*, 459 F.3d at 365 (quoting *Rowley*, 458 U.S. at 188-89, 102 S. Ct. 3034) (emphasis added)." *Gagliardo*, 489 F.3d at 115.

The majority opinion holds a small class size, such as those offered at Elan, "can be 'one element of the special education services' needed for a child." *Supra* ¶ 66 (citing *Frank G.*, 459 F.3d at 365). The Second Circuit's decision in *Frank G.*, however, specifically avoided holding small class size alone was sufficient to render the private placement at issue appropriate, because the teacher in that case adapted her instruction to meet the child's specific needs. *Frank G.*, 459 F.3d at 364-65.

¶ 109    In this case, neither plaintiffs nor the majority opinion has identified how the Elan school's program was specifically designed or adapted to meet Jenna's unique needs. Indeed, Hawkins testified she never conducted a formal evaluation or assessment of Jenna. *Supra* ¶ 23. Accordingly, the hearing officer could reasonably conclude the services Elan offered were those of a kind which might be preferred by parents generally, but not warranting reimbursement under IDEA in this case. This failure of proof alone is sufficient to sustain the hearing officer's decision.

¶ 110    The hearing officer's analysis, however, went further:

> "It appears to the Hearing Officer that Jenna's emotional problems manifested themselves in high risk behaviors outside of school, in the community, and were not necessarily the school's concern. The evidence indicated that much of Jenna's problems (absences) stemmed from parent-child management issues. It is not necessarily the school's duty to provide a residential placement for a child who does not listen to her parents and is a chronic runaway, for psychological reasons unrelated to the school."

Indeed, after discussing whether the Elan school was the LRE for Jenna, the hearing officer returned to a related point:

> "Furthermore, the placement must be for educational reasons. Time and time again, the Petitioner repeatedly stated at the Hearing that he was concerned about the Student's 'safety and security'. While naturally these are concerns any father would have for his daughter, they are not necessarily the school district's concerns, where, as in this case, the student's primary disability was *emotionally* based, rather than *learning* based (although she did have a secondary classification of a non-verbal learning disorder, her standardized test scores and grades at Elan showed that Jenna was quite capable of learning in a highly-structured environment)."

Although unmentioned by the hearing officer, federal appellate courts have differed in their approaches to residential placements under IDEA and its predecessor, particularly where the child's disability is primarily medical, social or emotional. See generally *Jefferson County School District R-1 v. Elizabeth E.*, 702 F.3d 1227, 1232-34 (10th Cir. 2012) (and cases discussed therein). Of particular note is *Dale M.*, in which the Seventh Circuit ruled the parents were not entitled to reimbursement for placing their child at the Elan school after his release from jail because the purpose of the placement was confinement, which the court concluded is

not a "related service" under the IDEA as a matter of law. See *Dale M.*, 237 F.3d at 816-17.[11] The majority opinion does not expressly adopt any of the approaches taken by federal appellate courts to this type of case. To the extent the majority opinion focuses on whether the placement provided "special education," as that term is defined by the IDEA, its approach is consistent with the Tenth Circuit's approach (see *Jefferson County School District R-1*, 702 F.3d at 1235) and to that extent I concur with the majority opinion's focus on the statutory text, if not its interpretation of that text.

¶ 111 In sum, although I partially concur in the majority opinion's discussion of the standard of review and its focus on the statutory text, I conclude the adoption of a rule limiting retrospective testimony by the defendants is inappropriate regarding reimbursement prior to March 2009, and unfairly applied solely against the defendants. Moreover, any error of law in the hearing officer's decision does not preclude this court from affirming the denial of reimbursement, based on the reasons actually provided by the hearing officer. In particular, I conclude plaintiffs failed to prove the Elan school's program was specifically designed or adapted to meet Jenna's unique needs. Lastly, the majority opinion fails to address the circuit court's finding of unreasonableness with respect to actions taken by the parents. For all of the aforementioned reasons, I respectfully dissent.

---

[11]The record in this case establishes the Elan school provided more than confinement, even if plaintiffs ultimately failed to prove the Elan school's program was specifically designed or adapted to meet Jenna's unique needs.